George A. **ROSENBLOOM**

v.

**METROMEDIA, INC.**, Appellant.

No. 17559.

United States Court of Appeals
Third Circuit.

Argued May 19, 1969.

Decided Sept. 15, 1969.

As Amended Oct. 6, 1969.

denied, a verdict was returned in favor of the plaintiff for $25,000 in compensatory damages and $750,000 in punitive damages. The district judge reduced the punitive award to $250,000 on remittitur, which was accepted by plaintiff, but denied defendant's alternative motions for judgment n. o. v. or a new trial. 289 F.Supp. 737 (E.D.Pa.1968). Defendant appeals.

In the spring of 1963, plaintiff became a distributor in and around the Philadelphia, Pennsylvania area of nudist magazines published by Outdoor American Company. In the fall of 1963, acting upon complaints concerning obscene magazine and books sales in the city, Captain Clarence Ferguson of the Philadelphia Police Department's Special Investigations Squad carried out first an investigation and then, after October 1, 1963, a series of arrests in connection with the investigation. A raid was made on plaintiff's home and warehouse, his magazines were confiscated, and he was arrested.

The first series of allegedly defamatory radio broadcasts dealing with the raids were made on October 4 and 5 as part of the regular newscasts on the hour and half hour. The first such broadcast was that of October 4, 1963, at 6:00 p. m.:

> "City Cracks Down on Smut Merchants
>
> "The Special Investigations Squad raided the home of George Rosenbloom in the 1800 block of Vesta Street this afternoon. Police confiscated 1000 allegedly obscene books at Rosenbloom's home and arrested him on charges of possession of obscene literature. The Special Investigations Squad also raided a barn in the 20 Hundred block of Welsh Road near Bustleton Avenue and confiscated 3000 obscene books. Captain Ferguson says he believes they have hit the supply of a main distributor of obscene material in Philadelphia."

This news report was repeated as part of later news broadcasts some seven times with substantially the same text. The

Bernard G. Segal, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa. (Samuel D. Slade, A. Stephens Clay, Philadelphia, Pa., on the brief), for appellant.

Allan A. Tuttle, Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City (Arthur J. Goldberg, Benjamin Paul, New York City, on the brief), for appellee.

Before FREEDMAN, SEITZ and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

George Rosenbloom (plaintiff) brought an action for libel in the district court based on diversity of citizenship against Metromedia, Inc. (defendant), alleging that certain radio broadcasts in October of 1963 by WIP, a radio station in Philadelphia managed and controlled by defendant, injured his reputation. The case was tried to a jury, and, after defendant's motions for a directed verdict and for binding instructions were

variations involved the use of the word "reportedly" for "allegedly," the use of "the Police believe" for "Captain Ferguson says he believes" in the third sentence, the insertion of the word "allegedly" before "obscene books" in the second sentence, and the substitution in the last broadcast of the phrase "smutty periodicals" for the reference to "obscene books." Apparently, the only alleged libel in the first series was in the failure to use the word "allegedly" in certain places in the quoted broadcast.

The second series of allegedly defamatory broadcasts occurred on October 21, 25 and November 1, again as part of the regular news broadcasts on the hour and half hour. They consisted of reports of a law suit brought by plaintiff and two publishers to enjoin the allegedly illegal arrests and defamatory statements. The first of this series was broadcast October 21 at 8:30 a. m.:

> "Federal District Judge Joseph S. Lord, Third, will hear arguments today from two publishers and a distributor * * * all seeking an injunction against Philadelphia Police Commissioner Howard Leary * * * District Attorney James C. Crumlish, Jr. * * * a local television station and a newspaper * * * ordering them to lay off the smut literature racket.

> "The girlie-book peddlers say the police crackdown and continued reference to their borderline literature as smut or filth is hurting their business. Judge Lord refused to issue a temporary injunction when he was first approached. Today he'll decide the issue. It will set a precedent * * * and if the injunction is not granted * * * it could signal an even more intense effort to rid the city of pornography."

Succeeding reports were in a similar vein. All made reference to "smut" and/or "girlie-books" and implied that the distributor and the two publishers wanted to stop all obscenity raids throughout the city, even as against literature that was in fact pornographic and even though plaintiffs had nothing to do with its distribution. The implication was not justified since plaintiffs had only sought to prevent alleged police harassment of them alone and asserted that their publications were not obscene. In one such broadcast "allegedly" was omitted before "smut distributors". At no time did the broadcasts mention the names of the distributor and publishers involved in the lawsuit. Although defendant contends to the contrary, we shall accept the district court's conclusion that certain of the statements in the two series were defamatory as a matter of Pennsylvania law and, in the circumstances, created a jury issue under such law.

Defendant's principal contentions on appeal are that the district court erred in refusing to hold that the action was controlled by the federal constitutional standard of "actual malice" as defined in New York Times Co. v. Sullivan[1] and that when so tested the evidence was insufficient to submit the case to the jury.

### I.

Freedom of speech and of the press are of course secured by the First Amendment. Practical implementation of those important principles is found in several recent Supreme Court pronouncements, although admittedly none are factually controlling here. Those cases teach that the First Amendment guarantees must be applied broadly lest they suffocate for lack of breathing room. They demonstrate that some degree of abuse is inescapable if the press is to discharge its function adequately; that such abuse must be tolerated or the guarantee will be unduly chilled by the threat of defamation actions, with resultant damage to the general public which is the primary beneficiary of the guarantee.

But actions for defamation of character have long been recognized as serving an important function in protecting the

---

1. 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

rights of citizens. "The rule that permits satisfaction of the deep-seated need for vindication of honor is not a mere historic relic, but promotes the law's civilizing function of providing an acceptable substitute for violence in the settlement of disputes." Afro-American Publishing Co. v. Jaffe, 125 U.S.App.D.C. 70, 366 F.2d 649, 660 (1966). The problem is to find a standard reflecting an accommodation between the competing values in the context of each factual setting. We address ourselves to that task.

## II.

▮ Preliminarily, we note that the fact that the news medium here is a radio station rather than a newspaper does not make the First Amendment discussion, in particular with regard to freedom of the press, any less germane. Radio and television were, of course, unknown media when freedom of the press was written into the Bill of Rights, but no rational distinction can be made between radio and television on the one hand and the press on the other in affording the constitutional protection contemplated by the First Amendment. Rumely v. United States, 90 U.S.App. D.C. 382, 197 F.2d 166 (1952), aff'd, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770 (1953).

In our case the subject matter of the first set of broadcasts alleged by plaintiff to be defamatory is a series of police raids on alleged distributors and sellers of obscene matter. Such raids were made by the police only after public complaints about the widespread dissemination of obscene literature in the center city area of Philadelphia had provoked a major police investigation. We have no doubt that these raids were matters of public interest.

The second series of broadcasts dealt with the institution and development of a legal action by plaintiff and two publishers against an influential segment of the news media (all major local newspapers and the local CBS–TV affiliate), as well as against the City of Philadelphia, its Police Commissioner, and its

district attorney to end harassment of plaintiffs in the operation of their businesses. Again, it is clear to us that the subject matter was of real public interest. Indeed, the Supreme Court has construed broadly the concept of a matter or an issue of public interest:

"The guarantees for speech and press are not the preserve of political expression or comment upon public affairs, essential as those are to healthy government. One need only pick up any newspaper or magazine to comprehend the vast range of published matter which exposes persons to public view, both private citizens and public officials. Exposure of the self to others in varying degrees is a concomitant of life in a civilized community. The risk of this exposure is an essential incident of life in a society which places a primary value on freedom of speech and of press. 'Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.' Thornhill v. Alabama, 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093." Time, Inc. v. Hill, 385 U.S. 374, 388, 87 S.Ct. 534, 542, 17 L.Ed.2d 456 (1967).

▮ Not only did the broadcasts under attack concern subject matter of public interest, but of equal significance they involved broadcasts of "hot news" items, i. e., summaries of the latest news given on the hour and the half hour in reports ranging from ninety seconds to ten minutes. In one of the ten minute broadcasts containing alleged defamatory matter there were eighteen separate items of news covered. The primary value of these items to the public is in conveying the latest news as promptly as possible so that it has the opportunity to be informed of news items of possible immediate public concern. It is not realistic to require thorough research or verification of each individual item under these conditions. The need for constitutional protection in the circumstances

is much more apparent than in the cases of the so-called documentaries or feature stories where time is available to attempt to verify questionable material.

In its discussion of malice in connection with its consideration of the state law issue of punitive damages, the district court stated that "This is not then a case where a newsworthy incident occurs spontaneously and a news purveyor must rely on eyewitness accounts subject to the vicissitudes of human perception." Viewing these broadcasts from a First Amendment perspective, we think this was an unduly narrow evaluation of the function of the newscasts. The district court's approach in effect imposes a duty on the broadcaster to be "right" except in the most limited circumstances and therein lies its vice when judged by First Amendment standards.

### III.

The district court concluded that the First Amendment was inapplicable because plaintiff was not a public figure within the meaning of that term as employed in Curtis Pub. Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). Contrary to the view of the district court, we do not consider the absence of a public figure of controlling importance here. Considering the type of news broadcasts involved as well as the established public interest in the subject matter, we conclude that the fact that plaintiff was not a public figure cannot be accorded decisive importance if the recognized important guarantees of the First Amendment are to be adequately implemented. In Time, Inc. v. Hill, supra, the Court applied the Times rule to false reporting of "matters of public interest" in connection with an action for invasion of the right to privacy by a private individual. See also Linn v. United Plant Guard Workers, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), and Pickering v. Board of Education, 391

U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Our conclusion finds support in similar rulings of other courts. United Medical Laboratories v. Columbia Broadcasting System, 404 F.2d 706 (9th Cir. 1968), cert. den., 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969); Bon Air Hotel, Inc. v. Time, Inc., 295 F.Supp. 704 (S.D.Ga.1969); All Diet Foods Distributors, Inc. v. Time, Inc., 56 Misc.2d 821, 290 N.Y.S.2d 445 (Sup.Ct.1967). See also Time, Inc. v. McLaney, 406 F.2d 565 (5th Cir. 1969), cert. den., 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969).

█ It is our view that at least in the present factual context the proper accommodation between the First Amendment protections and the state law of defamation is found by requiring a plaintiff to meet the standard of proof formulated in New York Times Co. v. Sullivan, supra, i. e., that in order to recover damages here, plaintiff must prove that the statement was made with "actual malice"—either with knowledge that it was false or with reckless disregard of whether it was false or not. In adopting the accommodation reflected in the actual malice standard we are not precluding plaintiff and others in similar situations from recovering in actions for defamation of character. We are merely establishing the quantum and type of proof required to permit recovery. When the proof rises to the requisite level and quality:

> "the constitutional guarantees can tolerate sanctions against *calculated* falsehood without significant impairment of their essential function." Time, Inc. v. Hill, supra, 385 U.S. at 389, 87 S.Ct. at 543.

### IV.

It remains to be determined whether the evidence met the federal actual malice standard so as to be a proper case for the jury.[2] This we must do "to make certain that those [constitutional] prin-

---

2. We put aside the issue as to whether the jury instructions could be construed to have complied with the Times standard.

ciples have been constitutionally applied." Times v. Sullivan, supra, 376 U.S. at 285, 84 S.Ct. at 728. Preliminarily, we note that the district court found "that no one at WIP harbored any personal animus toward the plaintiff, George Rosenbloom." But the district court found strong evidence of malice under Pennsylvania law from the four pieces of evidence. We realize that, strictly speaking, the district court did not evaluate the evidence by federal standards, but we, of course, must do so. We will not evaluate seriatim under the controlling federal standard the evidence which the district court isolated on the issue of malice.

■ Plaintiff made one attempt to contact the radio station. On October 26 or 27, he went to the studios of WIP in order to inquire about the substance of the broadcasts about his activities. He talked on an inter-office phone with a part-time news broadcaster of the station who, upon plaintiff's request, read to him the text of the noon broadcast of October 21. Plaintiff then told the newscaster that his periodicals were found not to be obscene by the United States Supreme Court. The newscaster answered that the district attorney had said that the magazines in question were obscene. Plaintiff disputed this saying he had in his possession a statement by the district attorney saying that plaintiff's magazines were legal. The broadcaster then apparently hung up on him. This ended plaintiff's contact with the radio station.

The district court equated this incident with a refusal to broadcast a retraction [3] or worse. We think the evidence of the incident lacked both sufficient substance and clarity to meet the standard required to show actual malice. It amounted to little more than an argument and a difference of opinion between plaintiff and one of defendant's employees at a time when all except one of the challenged broadcasts had already taken place. Its value in considering the earlier broadcasts is dubious at best. Only one broadcast took place after this conversation. It is attacked on the ground that it contains an inaccurate statement concerning plaintiff's injunction action in that it stated that the district attorney considered plaintiff's publications to be smut and immoral literature. The transcript of the testimony shows that plaintiff's own attorney, when questioning defendant's representative concerning the allegedly defamatory portion of the last broadcast, said that he was not questioning its "accuracy". Furthermore, his examination of the same witness brought out that defendant's representative confirmed the story with the judge involved before the broadcast was made. We think that the episode described failed to provide evidence of actual malice with the requisite convincing clarity to create a jury issue under federal standards.

■ The district court next points to the failure of defendant's representative to confront plaintiff personally about the matter and its failure to look at the magazines to determine whether they were obscene as evidence of "a reckless disregard for a person in no position to make himself heard." We think the burden the district court would place on defendant is not constitutionally permissible under the Supreme Court cases. Defendant was reporting fresh news developments consisting of activities and charges made by public authorities and counter activities by the plaintiff in an area of public concern. Considering the subject matter and defendant's function, the First Amendment insulated it from the duty which the district court would impose on it as a matter of Pennsylvania law. Moreover, this record does not

---

3. In the Times case the Supreme Court queried, "Whether or not a failure to retract may ever constitute such evidence" [of malice when judged by constitutional standards] 376 U.S. at 286, 84 S.Ct. at 729.

show that defendant was on notice of any challenge to the accuracy of its reporting until after the next to the last broadcast. We have already noted that the accuracy of the last broadcast was first checked with the judge involved and its accuracy also apparently conceded at the trial. If, as might also seem to be the case, the district court evaluated such evidence on the basis of the standard of proof suggested in Justice Harlan's minority opinion in the Butts case,[4] our answer must be that we think the controlling rule should be the same as the Times rule which was applied by a majority of the Justices in the Butts case.

Finally, the district court concluded that the highly inflammatory references (girlie-book peddlers and smut distributors) in the second series of broadcasts constituted evidence of a reckless disregard of plaintiff's rights. But, as the Supreme Court said in Garrison v. Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964), "only those false statements made with the high degree of awareness of their probable falsity demanded by New York Times may be the subject of either civil or criminal sanctions." It is difficult to see how characterizing them as inflammatory tends to prove the requisite awareness of their probable falsity.

We conclude that the First Amendment standard of actual malice is applicable to the case and that the evidence was constitutionally insufficient to support a judgment for plaintiff. The district court should have granted defendant's motions for a directed verdict and for judgment n. o. v.[5]

The judgment of the district court will be reversed.

---

4. " * * * a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." Butts, supra, 388 U.S. at 155, 87 S.Ct. at 1991.

5. Plaintiff does not on appeal challenge our right to review on its merits the district court's denial of defendant's motion for judgment n. o. v. In any event, we think there was substantial compliance with F.R.Civ.P. 50(b).