438 F.2d 433
 C. R. GROVE, Appellant in No. 18756, Trustee, et al. and Altoona Clay Products, Inc., a corporation,
v.
DUN & BRADSTREET, INC., a corporation.
Appeal of ALTOONA CLAY PRODUCTS, INC., a corporation, in No. 18755.
 No. 18755.
 No. 18756.
 United States Court of Appeals, Third Circuit.
 Argued October 30, 1970.
 Decided February 8, 1971.
 As Amended on Denial of Rehearing March 15, 1971.
 
 John E. Evans, Jr., Evans, Ivory & Evans, Pittsburgh, Pa., for appellant, Altoona Clay Products, Inc. (Joseph A. Williams, Pittsburgh, Pa., on the brief) for appellants.
 Edmund S. Ruffin, III, Thorp, Reed & Armstrong, Pittsburgh, Pa. (Clyde A. Armstrong, Pittsburgh, Pa., on the brief) for appellee.
 Before FORMAN, SEITZ and ALDISERT, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 This protracted libel action is again before us requiring that we determine whether the constitutional standard first enunciated in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L. Ed.2d 686 (1964), extends to private subscription credit reports and whether there was sufficient evidence to support the jury's verdict. Following a $110,000 verdict for the plaintiff, the district court first granted defendant's motion for a new trial and subsequently entered judgment n. o. v. in favor of the defendant. This appeal followed.
 
 
 2
 Plaintiff, a Pennsylvania corporation engaged in the brokerage of bricks and tile, brought this diversity action against Dun & Bradstreet, a mercantile agency which supplies credit reports to its subscribers. Alleging libel of its business reputation, plaintiff sought damages emanating from the issuance of a false credit report in 1963. At the first trial plaintiff was limited to proof of special damages and a verdict was directed for defendant, Altoona Clay Products, Inc. v. Dun & Bradstreet, Inc., 246 F.Supp. 419 (W.D.Pa.1965). This court reversed, 367 F.2d 625 (3 Cir. 1966), holding that under Pennsylvania law the publication was libel per se and hence actionable without proof of special damages, but that proof of special damages should, in any event, be submitted to the jury. On remand, the jury awarded only general damages in the amount of $110,000. In a lengthy opinion, the trial court denied defendant's motion for judgment n. o. v., but granted a new trial, concluding that proof was lacking that (1) the recipients of the report understood its libelous nature; (2) plaintiff's loss of credit was a direct and proximate result of the erroneous publication, and (3) damages were more than nominal, 286 F.Supp. 899 (W.D.Pa. 1968). Thereafter, the court, in light of subsequent cases involving the Times doctrine, including this court's decision in Rosenbloom v. Metromedia, Inc., 415 F.2d 892 (3 Cir. 1969), cert. granted 397 U.S. 904, 90 S.Ct. 917, 25 L.Ed.2d 85 (1970), sua sponte vacated its new trial order and entered judgment for the defendant "to secure an appealable final order." The court believed it "proper * * * that the serious constitutional question involved here should be resolved before we embark upon a trial of the issues which may be a useless procedure under our view of the controlling constitutional standard."
 
 I.
 
 3
 Defendant periodically issued reports on the plaintiff, which was itself a subscriber to defendant's services. A report issued in January, 1963, included, in addition to the routine assessment of plaintiff's assets, liabilities, and overall rating,[1] a notation that a confession of judgment in the penal sum of $60,000 had been entered against it. In fact, the judgment had been entered against "Altoona Clay Products Company, Inc.," a predecessor to plaintiff's business, but nonetheless a separate corporate entity. Defendant's investigative agent had failed to note the distinction and the erroneous publication resulted. The standard by which this conduct is to be judged is indeed critical to plaintiff's action: clearly no test requiring "actual malice" can be satisfied by these operative facts.[2]
 
 
 4
 New York Times v. Sullivan concluded that "the constitutional guarantees require * * * a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with `actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279, 84 S.Ct. at 726 (1964). The Times rule "preempted the law of libel as it related to public officials, making the outcome of such a suit dependent not upon state constitutions, statutes, and decisions, but upon the First Amendment to the Constitution of the United States and its interpretation by the Supreme Court." Cepeda v. Cowles Broadcasting, Inc., 392 F.2d 417, 420 (9 Cir. 1968).
 
 
 5
 In Time, Inc. v. Hill, 385 U.S. 374, 388, 87 S.Ct. 534, 542, 17 L.Ed.2d 456 (1965), the Supreme Court held that "[t]he guarantees for speech and press are not the preserve of political expression or comment upon public affairs" and declared the constitutional privilege to "embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." In the companion cases of Curtis Publishing v. Butts (Associated Press v. Walker), 388 U.S. 130, 87 S.Ct. 1975, 18 L. Ed.2d 1094 (1966), these protections were extended to publications concerning "public figures." The burden of demonstrating "actual malice" was thus no longer limited to plaintiffs holding "a position in government [which] has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it." Rosenblatt v. Baer, 383 U.S. 75, 86, 86 S.Ct. 669, 676, 15 L.Ed.2d 597 (1965). Thus those who thrust themselves, either through political action or other activity which invokes public interest or concern, into the public limelight, may no longer find redress in the courts for alleged defamations occurring in the media, without at least a showing of "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); Curtis Publishing Co. v. Butts, supra; Garrison v. Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); Spahn v. Julian Messner, Inc., 18 N.Y.2d 324, 274 N.Y.S.2d 877, 221 N.E.2d 543, remanded on other grounds, 387 U.S. 239, 87 S.Ct. 1706, 18 L.Ed.2d 744 (1966).
 
 
 6
 Noting in Butts, supra, 388 U.S. at 152, 87 S.Ct. at 1990, "the basic theory of libel has not changed," and crystallizing the competing concerns of the First Amendment and "society's `pervasive and strong interest in preventing and redressing attacks on reputation,' Rosenblatt v. Baer, supra, 385 U.S. at 86, 86 S.Ct. 669," Justice Harlan cautioned, however, that
 
 
 7
 to take the rule found appropriate in New York Times to resolve the `tension' between the particular constitutional interest there involved and the interests of personal reputation and press responsibility * * * as being applicable throughout the realm of the broader constitutional interest, would be to attribute to this aspect of New York Times an unintended inexorability at the threshold of this new constitutional development. In Time, Inc. v. Hill, supra [385 U.S.] at 390, [87 S. Ct. 534], we counseled against `blind application of New York Times v. Sullivan' and considered `the factors which arise in the particular context.' Here we must undertake a parallel evaluation. 388 U.S. at 148, 87 S.Ct. at 1987.
 
 
 8
 To extend a privilege to defendant's publication greater than that afforded by traditional Pennsylvania libel law, then, we must determine if the facts before us involve a "public figure" or an issue of "real public interest," Rosenbloom v. Metromedia, supra, 415 F.2d at 895.
 
 
 9
 While we do not here decide whether a corporation is capable of status as a public figure, we hold first that plaintiff is not a public figure within the meaning accorded that term by the foregoing Supreme Court decisions. Not unaware of the difficulty in characterizing plaintiff as a public figure, defendant strenuously urges, therefore, that the issue here is one of legitimate public concern, rendering "the absence of a public figure of [no] controlling importance." Rosenbloom, supra, 415 F.2d 892 at 896.
 
 
 10
 Defendant asserts that plaintiff's credit is a "matter of interest to a segment of the public, viz., its suppliers, creditors, architects and public contractors." In support of this contention, defendant notes that plaintiff is a corporation chartered to do business by the Commonwealth of Pennsylvania, and that, in furthering the purposes of this corporate charter, plaintiff periodically involves itself in public projects, including sewerage treatment plants, public school buildings, post offices, public utilities, shopping centers and churches.
 
 
 11
 We cannot accept the theory that plaintiff's business or credit standing is a matter of "real public interest." It may generally be true that "the modern business corporation by virtue of its pervasive influence on the political, economic, and social aspects of American life, has necessarily become a subject of public concern to the extent that the critics of its operations and behavior must enjoy constitutional protection for erroneous statements made without actual malice."[3] But those cases which have required that corporate plaintiffs meet the more difficult constitutional quantum of proof have all involved corporations engaged in activities of real public interest, and are grounded in that distinction.[4] We are not here dealing with a publication or broadcast alleging, for example, that plaintiff caused substandard building material to be used in these projects. Such operative facts might constitute a matter of grave public interest. Our research discloses no case, however, which would support the application of the more rigorous standard to the covert reportage of the credit standing of a small brick and tile brokerage firm, and we decline to do so now.
 
 
 12
 In the view we take of this case, moreover, there is a more fundamental flaw in defendant's attempt to clothe itself in the protective cloak of the Times standard. Based on a thorough review of the cases interpreting and applying the Times doctrine, we hold that the defendant's publication is not a medium entitled to that extended constitutional protection. We reaffirm our conclusion in Rosenbloom that "no rational distinction can be made between radio and television on the one hand and the press on the other in affording the constitutional protection contemplated by the First Amendment," 415 F.2d 892 at 895. We find such a distinction patent, however, between a publication which disseminates news for public consumption and one which provides specialized information to a selective, finite audience. To be sure, defendant's publication is not held out for public consumption. By contractual stipulation, each subscriber agrees that
 
 
 13
 [a]ll information whether printed, written or oral, submitted in answer to regular or special inquiry or voluntarily furnished to the subscriber by Dun & Bradstreet, Inc., is for the exclusive use of the subscriber. Such information shall be held in strict confidence and shall never be revealed or made accessible in any manner whatever to the persons reported upon or to any others. (Emphasis supplied.)
 
 
 14
 As the court noted in denying a motion to dismiss in Packaging Industries, Inc. v. Dun & Bradstreet, 67 Civil 4638 (S.D.N.Y.1969), a case strikingly similar to this action:
 
 
 15
 [T]his defendant, for a fee, presents private clients with a confidential report. It comes before this court in a situation quite unlike that of the defendants in Sullivan and Butts. It has not assumed the role of informing the public at large; pursuant to its own requirement confidentiality must be maintained. The application of a special privilege to this case would be an extension well beyond the limits previously established.
 
 
 16
 The confidential nature of these reports further underscores the inapplicability of the Times doctrine. In the Butts case, Justice Harlan characterized Times as resting on "the hypothesis that speech can rebut speech, propaganda will answer propaganda, free debate of ideas will result in the wisest government policy," 388 U.S. 130 at 153, 87 S.Ct. 1975, at 1990. Justice Harlan was persuaded that Mr. Butts and General Walker "both * * * had sufficient access to the means of counterargument to be able `to expose through discussion the falsehood and fallacies' of the defamatory statements." Id. at 155, 87 S.Ct. at 1991. Plaintiff here is denied that opportunity to respond to such false assertions both because it lacks the very access to the medium which Times and its progeny assumed, and for the more pernicious reason that the source or nature of the assertions may never be exposed.
 
 
 17
 Nor can defendant's reports be characterized as opinion, comment, or criticism. Their efficacy and value depend on their factual nature, and though there be a conditional privilege under the law of most states regarding the dissemination of news and opinion, some three-fourths of the courts which have recognized the privilege delineate a distinction in the case of false assertion of fact.[5]
 
 
 18
 We find that the lower court was eminently correct in its broad construction of the concept of "real public interest"; yet its mistaken reliance on Rosenbloom merely emphasizes why the standards applied there are inapposite here:
 
 
 19
 "One need only pick up any newspaper or magazine to comprehend the vast range of published matter which exposes persons to public view, both private citizens and public officials. * * * `Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.' Thornhill v. Alabama, 310 U.S. 88, 102, 60 S.Ct. 736, 84 L. Ed. 1093." Time, Inc. v. Hill, 385 U. S. 374, 388, 87 S.Ct. 534, 542, 17 L. Ed.2d 456, 415 F.2d at 895.
 
 
 20
 One can no more merely "pick up" one of defendant's reports, even when he is himself its subject, than he can participate in "freedom of discussion" about its contents.
 
 
 21
 We hold, therefore, that the doctrine of New York Times v. Sullivan does not extend to private subscription credit reports, and that any allegations of defamation concerning such reports are properly subject to the libel laws of the several states.
 
 II.
 
 22
 The district court directed that its original order of July 16, 1968, granting defendant's Motion for a New Trial, take effect only in the event that we reverse the February 4, 1970, order granting judgment n. o. v. for the defendant.
 
 
 23
 It is settled in this circuit that motions for new trial are addressed to the sound discretion of the district court and, ordinarily, its disposition of such motion will not be disturbed, Wagner v. Pennsylvania R. Co., 282 F.2d 392 (3 Cir. 1960), except in exceptional cases. Silverii v. Kramer, 314 F.2d 407 (3 Cir. 1963). In Lind v. Schenley Industries, 278 F.2d 79, 90 (3 Cir. 1960), the trial court had entered judgment for defendant and granted a conditional new trial. In reversing, and finding that the district court had abused its discretion in conditionally granting the new trial motion, Judge, then Chief Judge, Biggs stated: "the trial judge in negating the jury's verdict has, to some extent at least, substituted his judgment of the facts and the credibility of the witnesses for that of the jury"; in this situation, "[i]t then becomes the duty of the appellate tribunal to exercise a closer degree of scrutiny and supervision" than when the issue is not the weight of the evidence but only trial error. See also Lewin v. Metropolitan Life Insurance Co., 394 F.2d 608 (3 Cir. 1968). Because the weight of the evidence was the issue critical to the district court's conditional grant of a new trial in the case before us, we shall "exercise a closer degree of scrutiny" in determining whether there has been an abuse of discretion.
 
 
 24
 Although defendant continues to raise several arguments regarding the issues of actionability, libel per se as distinguished from libel per quod, the defamatory nature of the report, malice, plaintiff's solvency, and contributory negligence, each was disposed of by this court in our earlier opinion in this case, 367 F.2d 652 (1966).[6] We will discuss, therefore, only the question of the sufficiency of plaintiff's evidence to support the damage award of $110,000.[7]
 
 
 25
 Plaintiff was not financially stable in the years immediately prior to the publication of the defamatory report. Gross sales had declined every year from 1958 to 1963. Losses and liabilities mounted. The limited assets of this closed corporation were of dubious value. From this evidence the district court concluded that no more than nominal damages were possible. We disagree. A business in an economically precarious position may well suffer greater damages as a result of the issuance of a defamatory credit report than would a financially sound corporation whose credit would not otherwise be open to question.
 
 
 26
 Severe credit restrictions were imposed upon plaintiff by its suppliers which foreclosed from plaintiff's reach several anticipated lucrative contracts. Suppliers Glen Gery Shale Brick Corporation, Metropolitan Brick Company, Alliance Clay Products Company, and Central Commercial Company all rescinded, within the three months immediately following the issuance of the report, previously unrestricted credit standing, or insisted, for the first time, that there be strict compliance with previously unenforced credit terms. Credit ceilings of $5,000 were established, with 60, or, in some cases, only 30 days to remit. Glen Gery alone provided approximately 40% of plaintiff's brick supply. Three weeks after restricting plaintiff's credit, Central Commercial referred specifically to the report and the judgment in a letter to plaintiff.
 
 
 27
 Restriction of credit is damaging to any business. But the modus operandi of plaintiff, a brokerage firm, rendered such limitations fatal. T. D. Pegnetter, plaintiff's president, testified that
 
 
 28
 because I was doing large construction jobs, servicing large jobs out of that plant, and * * * the contractors were slow, we had a slow turnover of accounts receivable, so naturally our accounts payable would get sixty to ninety to a hundred twenty days behind.
 
 
 29
 Q. And were you in a position to pay off the company such as Glen Gery, or were you required to rely upon credit?
 
 
 30
 A. I had — the whole business was — I had to rely on credit, not just Glen Gery, but the whole business had to rely directly on credit.
 
 
 31
 Pegnetter testified that Quaker Sales Company, which had granted an exclusive distributorship to plaintiff terminated its business relationship with plaintiff in reliance on the report. Pegnetter testified further that Elvin Overdorff, Jr., president of Quaker Sales, accused him of lying when he repeatedly denied the outstanding judgment. It was through Overdorff that Pegnetter first learned of the existence of the report. Overdorff demanded all the cash plaintiff had on hand and a note payable at $500 per month for the balance of the $11,000 which plaintiff owed Quaker.
 
 
 32
 Correction of the report by defendant did not restore the various creditors' confidence in plaintiff; the 30 and 60-day, $5,000 credit lines were retained. Plaintiff testified as to several major contracts which it "missed because of the credit restrictions."[8] Forced into receivership in early 1964, plaintiff was deprived of future profits. Moreover, plaintiff introduced testimony that sale of the company's tangible assets by the receiver resulted in a $26,000 loss from fair market value.
 
 
 33
 The jury's award is not rendered fatal because it exceeds the demonstrated substantial specific damages reflecting a decrease in trade or loss of profits. Indeed, the court charged that less tangible injuries were equally compensable:
 
 
 34
 the items which are considered in support of such a claim of general damages are the damages to its business reputation, the decrease in trade or business suffered, loss of profits, and the general pecuniary harm which would normally result from such a publication.
 
 
 35
 Whether the aggregate of plaintiff's damages should have reached $110,000 is not within our province — nor that of the district court — to determine. Pennsylvania statutorily vests the jury with that power of evaluation where negligence or malice is shown in civil libel cases.[9] While it is true that data supporting all the items within the penumbra of general damages is not identifiable, this is not unusual in cases predicated on negligence. For example, in the run-of-the-mill personal injuries case, the recoverable items with respect to loss of wages, past medical expenses, and loss of future earnings reduced to present worth are easily discernible. The more abstract damages reflecting pain, suffering, and inconvenience — past, present and future — are generally not reflected with mathematical precision in the record. And in many cases an analysis of jury awards discloses that the bulk of the verdict is attributable to this particular item.
 
 
 36
 Thus, in the instant case, the jury had for its consideration, in addition to loss of trade and profits, the damage to appellant's business reputation and "the general pecuniary harm which would normally flow from such a publication." The inclusion of these items for jury consideration was not questioned at trial or on appeal. "[A]s this Circuit has frequently reiterated, while an award may be high, it should stand if there is ample evidence to justify it. It is not [the] prerogative [of the court] to arbitrarily substitute [its] judgment for that of the jury." Fabrizi v. Griffin, 162 F.Supp. 276, 279 (W.D.Pa.1958).
 
 
 37
 On the basis of all the evidence, we conclude that the damage award was not without sufficient support.
 
 
 38
 In light of our prior opinion in this case, we find no merit in defendant's assertion that it was error to admit the testimony of two expert witnesses to show how the report was received.[10] Finally, we reject defendant's contention that plaintiff's summation was prejudicial; moreover, because no exception was taken until motion was made for a new trial, the objection was, in any event, untimely. Giffin v. Ensign, 234 F.2d 307, 316 (3 Cir. 1956); Fabrizi v. Griffin, supra.
 
 
 39
 Accordingly, the order of the District Court filed February 4, 1970, will be reversed, including that portion of the said order which granted a conditional new trial, and the cause will be remanded for entry of judgment in favor of plaintiff in accordance with the verdict of the jury.
 
 
 
 Notes:
 
 
 [1]
 All of defendant's subscribers are furnished a rating card which approximates the overall financial strength the subject is deemed to enjoy. Plaintiff's rating was E-3½, which imputed a strength of $20,000-$35,000, with limited credit standing
 
 
 [2]
 Defendant presses the argument that the precise behavior before us — investigatory error — has been deemed constitutionally insufficient to support an action governed byTimes and subsequent cases. We do not quarrel with that statement. See New York Times, supra, 286-288, 292, 84 S.Ct. 710; Garrison v. Louisiana, 379 U.S. 64, 73-75, 79, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). This court has held that "investigatory failures alone are insufficient to show recklessness on the part of a newspaper". Baldine v. Sharon Herald, 391 F.2d 703, 706 (3 Cir. 1968). We recognize, therefore, that if the governing standard in this action be the Times rule, plaintiff's case must fail.
 
 
 [3]
 Libel and the Corporate Plaintiff, 69 Col.L.Rev. 1496, 1505 (1969)
 
 
 [4]
 United Medical Laboratories v. C. B. S., 404 F.2d 706, 711 (9 Cir. 1968):
 The crucial question here then is whether First Amendment immunity can properly be regarded as extending to disclosure and discussion of professional practices and conditions in the health area involved, so that those engaged in the particular field who may claim to have been stained by such a publication will be subject, in any seeking of redress, to application of the federal standard for defeasance of the Amendment immunity, instead of to the standards of state libel law for recovery.
 BonAir Hotel, Inc. v. Time, Inc., 295 F.Supp. 704, 708 (S.D.Ga.1969):
 [I]n bringing to light the exorbitant prices charged for accommodations during the [Masters'] Tournament the article possessed a valid public interest in its subject-matter which, apart from any other consideration, brings defendants within the constitutionally protected area of free expression.
 See also Arizona Biochemical Co. v. Hearst Corp., 302 F.Supp. 412 (S.D.N.Y. 1969); All Diet Food Distributors v. Time, Inc., 56 Misc.2d 821, 290 N.Y.S.2d 445 (Sup.Ct.1967).
 
 
 [5]
 Prosser on Torts, 814 (3rd Ed.)
 
 
 [6]
 After a thorough review of the applicable Pennsylvania law, this court, speaking through then Chief Judge Staley, concluded:
 The publication in question being defamatory on its face and of such a nature that proof of special damages is unnecessary, the plaintiff is entitled to recover unless the defendant can establish either the defense of truth or privilege. Cosgrove Studio & Camera Shop, Inc. v. Pane, 408 Pa. at 317. 182 A.2d at 753, 367 F.2d 625, 631.
 As we noted, though there be a privilege under Pennsylvania law, "want of reasonable care and diligence to ascertain the truth, before giving currency to an untrue communication, will destroy the privilege," O'Donnell v. Philadelphia Record Co., 356 Pa. 307, 51 A.2d 775, 367 F.2d 625, 631. The court below charged the jury with these very words. We remanded this case for a jury determination of whether defendant's agent was negligent in his investigation. Since defendant raises no challenge to the court's instruction as to what constitutes negligence under Pennsylvania law, we accept plaintiff's argument that "these instructions fairly stated the law and there is no reason to believe that the jury did not follow and apply them to the testimony in the case, when it awarded plaintiff a verdict of $110,000 for general damages." See citations in our earlier opinion, 367 F.2d 625, 631-632.
 
 
 [7]
 Chief Judge Staley also concluded:
 Since this case will be remanded for a new trial, we must point out that we cannot concur in the district court's conclusion that plaintiff's proof on the issue of damages was insufficient. Though plaintiff's proof was far from conclusive [partly due to the improper exclusion of testimony by plaintiff's president], in light of the Pennsylvania cases, especially those cited by the district court, we believe it was sufficient for the jury's consideration. Cf. Dun & Bradstreet, Inc. v. Nicklaus, 340 F.2d 882 (C.A.8, 1965).
 Since the proofs were largely the same at the two trials, we might well view our prior holding as dispositive of the insufficiency claim as well. Nevertheless, if only because of the disparity of results between the two trials, we choose to review briefly the sufficiency question again.
 
 
 [8]
 Plaintiff adduced testimony concerning ten specific projects in which the aggregated anticipated profits, calculated at 15% of the contract sale prices, would total at least $19,500
 
 
 [9]
 12 Purd.Stat.Anno. § 1583:
 In all civil actions for libel, no damages shall be recovered unless it is established to the satisfaction of the jury, under the direction of the court as in other cases, that the publication has been maliciously or negligently made, but where malice or negligence appears, such damages may be awarded as the jury shall deem proper.
 
 
 [10]
 See note 6,supra. In any event, we find that the admission of this testimony was not error. Interpreting credit reports may be so esoteric as to be beyond "the range of ordinary training, knowledge, intelligence and experience," Commonwealth v. Kaufman, 182 Pa.Super. 197, 203, 126 A.2d 758, 761 (1956), to render expert testimony on the subject admissible. And "the fact that the opinions [may be] in reference to the ultimate issue to be decided by the jury does not bar them, if otherwise admissible: Cooper v. Metropolitan Life, 323 Pa. 295, 302-303, 186 A. 125," Lott v. Peoples Nat. Gas Co., 324 Pa. 517, 527, 188 A. 582, 586 (1937).