Max GORDON et al.

v.

RANDOM HOUSE, INC.,
Max Gordon, Appellant.

No. 72–2150.

United States Court of Appeals,
Third Circuit.

Argued Sept. 17, 1973.

Decided Nov. 7, 1973.

Benjamin Paul, Philadelphia, Pa., for appellant.

Ira P. Tiger, Ralph G. Wellington, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellee.

Before KALODNER, ALDISERT and GARTH, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

The question for decision is whether a genuine issue of material fact existed in a libel action thereby precluding entry of summary judgment in favor of the book publisher. Relying on Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S. Ct. 1811, 29 L.Ed.2d 296 (1971), and New York Times Co. v. Sullivan, 376 U. S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the district court, 349 F.Supp. 919, ruled as a matter of law that the alleged defamatory statements were not published with knowledge that they were false or with reckless disregard as to whether the statements were false. Contending that the publisher's affidavits in support of its motion for summary judgment and Gordon's opposing affidavits presented a jury question, the plaintiff has appealed. We reverse, vacate the judgment, and remand for the development of a complete record at trial.

I.

Max Gordon, a Philadelphia retailer of the Jewish faith, sued Random House, a book publisher, in libel for alleged defamatory statements contained in the prologue to a book entitled "The Negroes and the Jews" authored by Lenora E. Berson. The book was published in April, 1971.

The Prologue relates that Gordon had escaped the pogroms of Russia, had become a business retailer through the dint of hard work and sacrifice, and then had become a victim of the 1964 North Philadelphia black community riots. Counterposing the Gordon story is the story of "Earl," a black itinerant, allegedly interviewed on a Harlem park bench, who explains why he hates Jews, especially those in the retail business who sell cheap clothes at high prices and "gyp" blacks. The Prologue effectively portrays a picture of metropolitan neighborhoods becoming black and Puerto Rican, with "the Max Gordon's and their younger, more Americanized coreligionists . . . [forming] the business infra-structure," portraying Gordon as a Jewish merchant in conflict with "Earl" and other blacks: "As antagonists they may well hasten the nation down the bloody road of racism and reaction."

Plaintiff grounds his libel action, brought in diversity under 28 U.S.C. § 1332 with Pennsylvania substantive law governing, on the theory that the book's implication is that he is a dishonest merchant who cheats blacks and is causing trouble and difficulties for this nation.

It is the publisher's position that Gordon was not entitled to a trial on the substantive merits of this claim because, irrespective of whether Gordon was famous, he had become involved in a matter of "public or general concern" by his conduct when he telephoned his 1964 Philadelphia riot experiences to the Philadelphia Inquirer, which later published an account of Gordon's experi-

ences. The publisher contends that the relationship between Jewish merchants and inner-city blacks has been the subject of widespread public interest in national news magazines and many national and local publications. It is on this basis that Random House contends that it comes within the "involvement in an event of public or general concern" protection of the plurality opinion of *Rosenbloom*. Accordingly, the publisher argues that for Gordon to have the substantive merits of his libel claim heard, it is necessary for him to show that the "defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false or not."

Gordon does not contend that Random House published with actual knowledge of the falsehood. Rather he seems to proceed on twin theories: First, he contends that the *New York Times* rule does not apply and that Pennsylvania libel law of lack of reasonable care is the appropriate standard. Alternatively, if *New York Times* does apply, there is a sufficient issue of "reckless disregard": that considering the cumulative effect of the lack of investigatory efforts, of advertising the book as containing actual interviews, of the inaccuracy of the Prologue and of the inherent improbability of "Earl's" statements, a sufficient issue was joined to have a fact finder decide whether the publisher acted with a reckless disregard.

The publisher filed affidavits explaining that Lenora E. Berson represented that the factual statements in the Prologue concerning Max Gordon were based on an actual interview she had with him, plus information contained in the public press. In her deposition the author stated that she talked by telephone to a man representing himself as Gordon. For his part, Gordon denies either a face to face or a telephonic interview.

Random advertised: "Through *actual interviews* and personal experiences, the author analyzes the complex sociological and economic pressures exerted on and by [Blacks and Jews]. . . ." (Emphasis supplied.) Gordon, on the other hand, showed that "Earl" was never interviewed by Berson.

■ Random House sets forth affidavits by its representatives stating that it had no reason to doubt the author's veracity and, accordingly, made no further investigation. Gordon replies in kind that because of the potential for defamation Random House should have done more than take its author's word at face value. Gordon contends that the publisher should have investigated the authenticity of the critical interviews with Gordon and "Earl".[1]

## II.

The landmark *New York Times* case held that the constitutional guarantee of freedoms of speech and press imposed severe restrictions on the state libel laws when the allegedly defamatory publications related to official conduct of a public official. The Court said that these constitutional guarantees prohibit recovery of damages "unless he [the public official] proves that the statement was made with 'actual malice'— that is with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–280, 84 S.Ct. at 726. The Court required proof of "actual malice" presented with "convincing clarity" or proof of "the recklessness that is required for a finding of actual malice." 376 U.S. at 285–286, 288, 84 S.Ct. at 730.

The protection originally granted the publications relating to "public officials" were later extended to cover "pub-

---

1. Mere investigatory failures, without more, have been held insufficient to constitute "reckless disregard". *New York Times, supra;* Baldine v. Sharon Herald Co., 391 F.2d 703, 707 (3d Cir. 1968). In this case, however, Gordon relies not only on Random House's failure to make an investigation, but also on an accumulation of various other factors. *See, ante,* page 1358.

lic figures." Curtis Publishing Co. v. Butts and Associated Press v. Walker, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). The *Rosenbloom* plurality articulated both the legal precept and the procedural standards utilized by the district court in the case before us: ". . . a libel action . . . by a private individual . . . for a defamatory falsehood in a . . . [publication] relating to his involvement in an event of public of general concern may be sustained only upon clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false or not." 403 U.S. at 52, 91 S.Ct. at 1824. [Footnote omitted.] "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." 403 U.S. at 56, 91 S.Ct. at 1826.

### III.

We experience some discomfort in accepting the *Rosenbloom* plurality opinion as a definitive statement of the appropriate law for this proceeding. Although the district court seemed quick to accept the opinion of three Supreme Court Justices as ruling case law, we are constrained to observe that the affirmance of this court's judgment in that case was produced by a majority coalition of Supreme Court Justices for diverse reasons.[2]

Justice Black concurred in the result because he and Justice Douglas "[found] no room in the First Amendment for any defamation recovery whatsoever." 403 U.S. at 58, 91 S.Ct. at 1827. Justice Black is no longer on the court. Justice White concurred in the result because he found that Rosenbloom had been arrested by a police officer, a public official, and that therefore the *New York Times* doctrine was applicable: ". . . discussion of the official actions of public servants such as the police is constitutionally privileged. . . . In the present case, for example, the public would learn nothing if publication only of the fact that the police made an arrest were permitted. . . ." 403 U.S. at 61, 91 S.Ct. at 1828. It is open to conjecture whether Justice White would apply the *New York Times* rule to the facts in the case before us.

Justices Stewart and Marshall, dissenting, suggested a remand "for a determination of whether Mr. Rosenbloom can show any actual loss." 403 U.S. at 87, 91 S.Ct. at 1841. They expressly rejected the plurality's "conditional constitutional privilege for defamation published in connection with an event that is found to be of 'public or general concern.'"[3] 403 U.S. at 78, 91 S.Ct. at 1837.

2. "Given this spectrum of proposed restrictions on state defamation law and assuming that MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS, will continue in future cases to support the severest of the restrictions, it would seem that at least five members of the Court would support each of the following rules:

"For public officers and public figures to recover for damage to their reputations for libelous falsehoods, they must prove either knowing or reckless disregard of the truth. All other plaintiffs must prove at least negligent falsehood, but if the publication about them was in an area of legitimate public interest, then they too must prove deliberate or reckless error. In all actions for libel or slander, actual damages must be proved, and awards of punitive damages will be strictly limited."
403 U.S. at 58–59, 91 S.Ct. at 1827, White, J., Concurring.

3. "The threats to society's interest in freedom of the press that are involved in punitive and presumed damages can largely be eliminated by restricting the award of damages to proved, actual injuries. The jury's wide-ranging discretion will largely be eliminated since the award will be based on essentially objective, discernible factors. And the self-censorship that results from the uncertainty created by the discretion as well as the self-censorship resulting from the fear of large judgments themselves would be reduced. At the same time society's interest in protecting individuals from defamation

Justice Harlan, who is also no longer on the court, expressed still a fourth viewpoint: "It is, then, my judgment that the reasonable care standard adequately serves those First Amendment values that must inform the definition of actionable libel and that those special considerations that made even this standard an insufficiently precise technique when applied to plaintiffs who are 'public officials' or 'public figures' do not obtain where the litigant is a purely private individual." 403 U.S. at 72, 91 S.Ct. at 1833, Harlan, J., Dissenting.

Confronted with the foregoing diverse expressions, we are unable to share the certainty of the district court in accepting the *Rosenbloom* plurality as the law of this case. Justice Holmes' definition of law comes to mind: "The prophecies of what the courts will do in fact, and nothing more pretentious, are what I mean by the law." [4] Confronted with such divergence on the Supreme Court level, we suggest that the accuracy of our "prophecies" will depend upon the yet unarticulated First Amendment philosophies of Justices Powell and Rehnquist.

■ Because of the absence of a complete trial record, we have concluded that this case is not ready for adjudication of the constitutional issue. Neither this court nor the district court should hazard an adjudication on this truncated record.

The necessity for a full trial record is mandated because, insofar as the courts of this circuit are concerned, the ruling case law of *Rosenbloom* is that which is contained in our opinion when that case was before us. 3 Cir., 415 F.2d 892. There we were careful to emphasize: "It is our view *that at least in the present factual context* the proper accommodation between the First Amendment protections and the state law of defamation is found by requiring a plaintiff to meet the standard of proof formulated in New York Times Co. v. Sullivan, *supra, i. e.,* that in order to recover damages here, plaintiff must prove that the statement was made with 'actual malice'—either with knowledge that it was false or with reckless disregard of whether it was false or not. In adopting the accommodation reflected in the actual malice standard we are not precluding plaintiff and others in similar situations from recovering in actions for defamation of character. We are merely establishing the quantum and type of proof required to permit recovery." 415 F.2d at 896.[5] (Emphasis supplied.)

Recently in Taggart v. Wadleigh-Maurice, Ltd., 489 F.2d 434, 438 (3d Cir., 1973), this court reversed a grant

will still be fostered. The victims of the defamation will be compensated for their real injuries. They will not be, however, assuaged far beyond their wounds. And, there will be a substantial although imprecise and imperfect admonition to avoid future defamation by imposing the requirement that there be compensation for actual damages." 403 U.S. at 84–85, 91 S.Ct. at 1840, Marshall, J., Dissenting.

4. Holmes, The Path of the Law, 10 Harv.L. Rev. 457, 460–461 (1897).

5. Although not controlling, it is of no little importance that in *Rosenbloom*, we addressed ourselves to the fact that the broadcast concern is a "subject matter of public interest, but of equal significance they involve broadcast of 'hot news' items, i. e., summaries of the latest news given on the hour and the half hour in reports ranging from ninety seconds to ten minutes. In one

of the ten minute broadcasts containing alleged defamatory matter there were eighteen separate items of news covered. The primary value of these items to the public is in conveying the latest news as promptly as possible so that it has the opportunity to be informed of news items of possible immediate public concern. It is not realistic to require thorough research or verification of each individual item under these conditions. The need for constitutional protection in the circumstances is much more apparent than in the cases of the so-called documentaries or feature stories where time is available to attempt to verify questionable material." 415 F.2d at 895–896.

"Defendant was reporting fresh news developments consisting of activities and charges made by public authorities and counter activities by the plaintiff in an area of public concern." 415 F.2d at 897.

of summary judgment previously entered in favor of a defendant in an invasion of privacy case and remanded, observing:

> [Judgment for defendant] . . ., if it is to be made, should be made on a record in which the facts have been fully developed. Only with such a record can the necessary balance between the conflicting rights of personal privacy and of freedom of expression properly be struck. We realize that requiring the defendants to defend in a trial rather than to obtain summary judgment puts them to additional expense, and arguably subjects their first amendment rights, should those rights ultimately be held to prevail over [plaintiff's] . . . right to privacy, to that much extra "chill." In the context of the problem—their commercial exploitation of . . . [plaintiff's] allegedly induced performance—this degree of "chill" seems to us *de minimus* when compared with the unsatisfactory alternative of ruling on a potentially serious conflict between legally protected rights without a complete record.

It will be the responsibility of the district court to develop a trial record sufficient to accommodate intelligently that which Justice Marshall has described as "two essential and fundamental values. . . ." *Rosenbloom, supra,* 403 U.S. at 78, 91 S.Ct. at 1837. First, there must be a determination of whether Max Gordon can be said to have lived an obscure private life[6] or whether it can be said that prior to the Random House publication, he had taken part in a public controversy. The protection of the reputation of anonymous persons "from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty." Rosenblatt v. Baer, *supra,* 383 U.S. at 92, 86 S.Ct. at 679 (1966). (Stewart, J., Concurring.)

The threshold question of Gordon's private status *vel non* is of fundamental importance in determining whether he fits the mold of *Rosenbloom.* His entire lifestyle must be taken into consideration along with the evidence of the Philadelphia Inquirer story of 1964 following the North Philadelphia riots.

Countervailing the right to privacy is the equally respected concept of a citizenry informed by a free and unfettered press, a concept deemed basic to our system of ordered liberty. "Our citizenry has a legitimate and substantial interest in the conduct of . . . persons [intimately involved in the resolution of important public questions] and freedom of the press to engage in uninhibited debate about their involvement in public issues and events is as crucial as it is in the case of 'public officials.' " Curtis Publishing Co. v. Butts, 388 U.S. 130, 164, 87 S.Ct. 1975, 1996, 18 L.Ed.2d 1094 (1967) (Warren, C. J., Concurring in the result).

With the development of an adequate record, the district court will then be in a position to strike the proper balance between these two essential and fundamental values.

In Rosenblatt v. Baer, 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966), the Court stated "that, as is the case with questions of privilege generally, it is for the trial judge in the first instance to determine whether the proofs show respondent to be a 'public official.' "[7] Similarly, in this case the

---

6. *See, e. g.,* Associated Press v. Walker, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); Beckley Newspaper Corp. v. Hank, 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967); Greenbelt Publishing Assn. v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966).

7. "1 Harper & James, Torts § 5.29 (1956); Prosser, Torts § 110, p. 823 (3d ed. 1964), Restatement, Torts § 619. Such a course will both lessen the possibility that a jury will use the cloak of a general verdict to punish unpopular ideas or speakers, and as-

trial court must decide as a matter of law whether the subject matter of the alleged defamatory material constituted an event of "public or general concern," Rosenbloom v. Metromedia, 403 U.S. at 52, 91 S.Ct. 1811 (plurality opinion), at 78 (Marshall, J., dissenting), and then whether there was on the part of Gordon an "involvement in [such] an event. . . . ." *Ibid.*, 403 U.S. at 52, 91 S.Ct. 1811.[8] In this process the court will decide whether it will be appropriate to apply the test applied by this court under the "factual complex" of *Rosenbloom.* For ruling case law it will have the guidance of this court's opinions in *Rosenbloom*, and Grove v. Dun & Bradstreet, Inc., 438 F.2d 433 (3d Cir. 1971). Additionally, the district court will have the advantage of the four separate opinions of the Supreme Court Justices heretofore described.

## IV.

██ Separate and apart from the foregoing, other facets of this proceeding suggest the advisability of remand for a trial. In reviewing summary judgment, the question on review is whether there was a "genuine issue as to any material fact" before the district court. The presence of such an issue precludes the moving party from obtaining "judgment as a matter of law." F.R.Civ.Pro. 56(c).

██ In the posture we receive this case, we do not have a complete trial transcript, as did the Court in *New York Times* and *Rosenbloom.* We are not called upon to evaluate the quantum of evidence adduced at trial; we therefore do not have properly before us the question of whether the evidence met the "clear and convincing" test of the plurality of *Rosenbloom* or the "convincing clarity" test of *New York Times.*

We only decide whether a material fact is controverted in the context of a genuine issue.

## V.

██ Only for the purpose of this analysis and for the remainder of this discussion we shall assume the *Rosenbloom* plurality doctrine would be applicable to this case. So postured, our inquiry perforce is confined to an extremely narrow compass: Was there a genuine issue as to "reckless disregard"? We believe such an issue exists for the following reasons.

First, we are mindful of St. Amant v. Thompson, 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968), where the Court stated:

> The defendant in a defamation action . . . cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. . . . [The defendant will not] be likely to prevail when the [author's] . . . allegations are so inherently improbable that only a reckless man would have put them in circulation.

Random's affidavits state that it published with the belief that the statements concerning Gordon were true; however, it carefully avoided any statement as to whether it published with the belief that "Earl's" statements were true. Therefore, the reasoning of *St. Amant* applies, *a fortiori*, to this case, and the inherent improbability of "Earl's" statements becomes a crucial factual inquiry.

██ Earl's Prologue statements revealed that he viewed himself as a victim in almost every aspect of his life. The Jews were the sole cause of his victimization. Moreover, he saw the Jews as the reason for the riots. Plaintiff

---

sure an appellate court the record and findings required for review of constitutional decisions. Cf. Speiser v. Randall, 357 U.S. 513, 525, 78 S.Ct. 1332, 1341, 2 L.Ed.2d 1460; New York Times, 376 U.S., at 285, 84 S.Ct. at 728." 383 U.S. at 88 n. 15, 86 S. Ct. at 677.

8. We do not indicate at what stage of the litigation this ruling must be made, other than to require that "[t]he court shall inform counsel of its proposed action . . . prior to . . . arguments to the jury. . . . ." F.R.Civ.Pro. 51.

argues that the question of the inherent improbability of "Earl's" statements was an issue for the fact finder. The district court determined that there existed no genuine issue as to the inherent improbability of "Earl's" statements. It reasoned:

> As the increasing amount of consumer protection legislation and executive branch activity stands witness to, merchants, be they Jews or non-Jews, are neither physically nor intellectually incapable of victimizing their customers.

We believe that the district court's resolution of this question constituted an invasion into the province of the fact finder.

Second, Random relied upon Berson's representation that the factual statements in the Prologue concerning Max Gordon were based on an actual interview plus information contained in the public press. Random, however, made no attempt at corroboration. Gordon has denied any interview with Berson, telephonic or otherwise. Moreover, Random's affidavits do not reveal whether Berson represented that she interviewed "Earl" or whether Random sought such assurance from her. Yet Random's advertisement on the book jacket referred to "actual interviews."

The publisher asserts that it was required to do no more than take its author's word at face value. The plaintiff counters that because the publisher advertised that the book's contents were based on actual interviews, it should have conducted an investigation. Evaluation of detailed evidence supporting each of these contentions [9] was more properly the province of the fact finder, rather than the court. Inferences to be drawn therefrom were not for the litigants, not for the court, but solely for the fact finder. Moreover, the court must then decide, in the context of

"reckless disregard," whether a distinction may properly be drawn between the responsibility of a newspaper or radio station in the dissemination of "hot news" and that of a book publisher in the publication of a book. (See, *e. g.*, note 5, *supra.*)

In sum, whether this case be viewed as requiring a complete trial record in order to strike a proper balance between the right of privacy and the First Amendment or as presenting a genuine issue of material fact as to reckless disregard, we believe that this is a case for the evaluation of a fact finder.

The judgment of the district court will be vacated and the cause remanded for proceedings consistent with the foregoing.

---

9. Moreover, there should be a complete development of the role of the author in the preparation of her work, and a specific determination of what, if any, responsibility the publisher must bear if it be found that her conduct breached the standard of "reckless disregard."