**Daniel K. SCHREFFLER, Plaintiff,**

v.

**BOARD OF EDUCATION OF DELMAR SCHOOL DISTRICT et al., Defendants.**

**Civ. A. No. 79–217.**

United States District Court,
D. Delaware.

Jan. 30, 1981.

Education of the Delmar School District, the individual members of the Board, and the Superintendent of the school district,[1] seeking compensatory and punitive damages, and reinstatement for defendants' wrongful conduct in failing to renew plaintiff's contract as principal of Delmar High School. The jury awarded the plaintiff $113,000 as compensatory damages and $77,500 as punitive damages and assessed the punitive damages in varying amounts against each of the defendants individually. Presently before the Court are: plaintiff's motion for reinstatement as principal of Delmar High School and for expungement of all references to the plaintiff's wrongful non-renewal in records maintained by the Delmar School District (Docket Item ["D.I."] 46); and defendants' motion for judgment notwithstanding the verdict, for alteration or amendment of the judgment, or for a new trial.[2] (D.I. 49.) Pursuant to Local Rule 3.1C(3), the parties advised the Court of their belief that no briefing on these post-trial motions was necessary. This opinion represents the Court's disposition of these motions.

Sheldon N. Sandler of Bader, Dorsey & Kreshtool, Wilmington, Del., for plaintiff.

Nicholas H. Rodriguez of Schmittinger & Rodriguez, P. A., Dover, Del., for defendants.

## OPINION

LATCHUM, Chief Judge.

Plaintiff, Daniel K. Schreffler, brought this action against defendants, the Board of

## I. Background

The salient facts of this case may be briefly stated as follows: Daniel Schreffler was hired as Principal of Delmar High School by the Delmar Board of Education on June 30, 1977. (Trial Transcript ["Tr."] at A-52.)[3] In an interview one day preceding the formal offer of employment, which was conducted by the Board of Education, as then constituted,[4] and Mr. Bastian, Superintendent of the school district, Mr.

---

1. The individual defendants are Wayne C. Bastian, Superintendent and Secretary of the Board of Education of the Delmar School District, William L. Calloway, President of the Board, Faye B. Hudson, Vice-President of the Board, and C. Phillip Banks, Marion L. Foxwell and Pauline Hammond, members of the Board. The defendants are sued in their individual and official capacities.

2. Plaintiff's counsel has also filed a motion for an Award of Attorney's Fees and Expenses. (D.I. 47.) Counsel for the parties have agreed,

however, that disposition of this motion may be held in abeyance until the present motions have been decided by the Court.

3. The trial transcript will be referred to throughout this opinion as "Tr." Plaintiff's and defendants' exhibits will be noted as "PX." and "DX.", respectively.

4. The Board at that time was composed of the present defendants, with the exception of Mrs. Hammond, whose seat was then held by a person not involved in this suit. (Tr. at A-54.)

Schreffler was advised that if he were selected as principal he would be given an initial two year contract and if his performance during the two year period was "satisfactory," his contract would be renewed for an additional three years. (Tr. at A–55.) One month later, the Board also hired a new Assistant Principal, Carol Cordrey, who similarly was granted a two year contract and was informed of the same conditions for renewal of her contract. (Tr. at C–74.)

Despite some difficulties encountered during his first year, Schreffler received an overall satisfactory performance rating in a first year evaluation prepared by Superintendent Bastian on September 15, 1978. (DX. 2.) Plaintiff received a negative rating, however, in certain "personal profile" categories, including "emotional stability" and "sensitiv[ity] to the feelings of others" and also scored unsatisfactory marks in his relationships with "faculty, students, parents, and community" and with the "board and other administrators." (Id.) The evaluation further stated that the composite satisfactory performance rating had been prompted in part by several unique considerations, i. e., that many policy changes had been implemented in the school year, that both Schreffler and Cordrey were new to the school district and to their respective positions, and that Schreffler was appointed principal late in the summer of 1977. (Id. at 2.) Finally, the evaluation made several recommendations and concluded that "improvement will be necessary in those areas listed under the recommendations in order to retain a satisfactory performance rating. . . ." (Id.)

Schreffler responded to this evaluation on September 20, 1978 by requesting in writing more specific information concerning his alleged shortcomings as principal "so that specific behavior unacceptable to [the Superintendent] can be modified." (DX. 3.) Superintendent Bastian replied on October 20, 1978 by highlighting particular incidents

in which Schreffler had failed to use good judgment and by explaining in greater detail areas in need of improvement. (DX. 4.) The response noted, however, that progress had been made in certain respects during the present school year and that Schreffler was then complying with the responsibilities of his job description. (DX. 4 at 4.)

In the summer of 1978, Carol Cordrey, the Assistant Principal at Delmar, separated from her husband and began to date Mr. Schreffler.[5] (Tr. at C–66.) By September, rumors had begun to circulate in the community that Schreffler had "broken up" the Cordreys' marriage (Tr. at C–108) and some of these rumors reached Superintendent Bastian and certain members of the Board of Education. (Tr. at B–28, 63; D–192.) The rumors accelerated after September 20, 1978, when Schreffler sustained a broken arm in an altercation with Mr. Cordrey at the Cordrey residence. (Tr. at A–67.) When asked by interested persons about the cause of his injury, Schreffler refrained from disclosing the entire story in order to avoid embarrassing Mrs. Cordrey and simply replied that he had fallen in the driveway. (Tr. at A–67, 68.)

On November 6, 1978, at a routine administrators' meeting attended by Bastian, Schreffler, Cordrey and Kenneth Matthews, Administrative Assistant for the Delmar School District, Bastian questioned Schreffler and Cordrey about the rumors and was advised that they were in fact dating and would continue to do so. (Tr. at D–192.) Both Cordrey and Schreffler testified that Bastian reacted negatively to the news, stating that it was "absolutely terrible," and that Schreffler should not be dating single teachers of the Delmar High School. (Tr. at A–69, 70; C–69, 70.) In contrast, Bastian testified that he merely informed them that their social relationship was their personal business and that his only concern was that their relationship not interfere with school affairs.[6] (Tr. at D–192.)

---

**5.** Mrs. Cordrey and Mr. Schreffler were married on October 20, 1979. (Tr. at C–97.)

**6.** Unfortunately, the only disinterested party present at this meeting, Mr. Matthews, did not shed much light on what transpired by his testimony at trial. Mr. Matthews testified gen-

erally that the purpose of the discussion about the Cordrey-Schreffler relationship was simply to "surfac[e] facts" and to decide whether the Board should be advised of the situation, that there was some talk "about the supervision of a principal dating the assistant principal which

That same day, at a student disciplinary hearing attended by three Board members, Schreffler and Cordrey revealed to those present that they were dating and that Schreffler's broken arm occurred as a result of an encounter with Mr. Cordrey. (Tr. at A–71.) By all accounts, defendant C. Phillip Banks expressed his anger that Schreffler hadn't truthfully disclosed the origin of his injury when Banks previously asked him how the arm was broken. (Tr. at A–71, B–81.) Cordrey and Schreffler each further testified that the Board members generally were upset by the disclosure (Tr. at A–72, C–123), while the defendants denied this allegation. (Tr. at B–82, 113.)

On the morning of December 11, 1978, Bastian notified Schreffler for the first time that the renewal of his contract would be considered by the Board that afternoon. (Tr. at A–72, D–198.) At that meeting, Bastian voiced several criticisms about Schreffler's performance as principal, which, according to Schreffler, either had not heretofore been brought to his attention or were problems which were taken into account when he received his satisfactory evaluation in September. (Tr. at A–74, 90.) Subsequently, the Board unanimously voted not to renew Schreffler's contract. (*Id.*) Mrs. Cordrey's contract as Assistant Principal, however, was extended by the Board for a two year period. (Tr. at D–206.)

In response to a request by Schreffler, Superintendent Bastian sent him a letter dated December 19, 1978 setting forth in detail the reasons for Schreffler's non-renewal. (DX. 8.) Essentially, the letter noted in general terms that Schreffler had failed to show improvement in the areas cited as deficient in the September evaluation, and specifically criticized Schreffler's failure to arrive at work on time on several occasions during the preceding months. (DX. 8 at 2.) In particular, the letter stated that the Board was dismayed by Schreffler's apparent lack of concern about his tardiness problem at the December 11 meeting.[7] (*Id.*) In addition, the letter generally described several other areas in which improvement had not been noted and cited several specific incidents which occurred in Schreffler's first year as grounds for the Board's decision. (*Id.*)

At Schreffler's request, another public hearing on his contract renewal was held on January 25, 1979. (DX. 9.) This meeting was attended by several parents, students and faculty members who testified in support of the renewal of Schreffler's contract. In addition, Schreffler was represented by counsel who presented evidence in his behalf and asked each member of the Board whether they could now impartially consider the evidence presented at this hearing in light of the fact that a decision had already been made in December not to renew Schreffler's contract. (Tr. at B–32, 47, 110.) Each member of the Board affirmatively responded that they could impartially reconsider their earlier decision. (*Id.*) Nonetheless, on February 12, 1979, the

---

was, I thought, taken in good spirit," and that there were no specific directives laid down by Mr. Bastian. (Tr. at D–141, 144.)

7. Schreffler's job description required him to be at work by 8:00 a. m. (Tr. at A–123, 124.) Schreffler testified that he knew he had been late to work on several occasions during his first year as principal and that his tardiness was one of Bastian's complaints in the September evaluation. (Tr. at A–124.) At the December 11 hearing, Bastian read Schreffler a list of six dates occurring after the September evaluation when Schreffler again had been late to work. (Tr. at A–125, 126; E–20.) Schreffler testified at trial that he had no information which could deny or confirm Bastian's claim and that he hadn't realized "what level of importance [Bastian] put on [Shreffler's timeliness] until the December 11 School Board meeting."

(Tr. at A–125.) Although Schreffler further testified that he thought he was punctual at least 95% of the time (Tr. at A–131), at the December 11 hearing he attempted to justify those occasions when he was late by explaining that he encountered delays traveling to work because of the number of school buses which frequented the route he traveled from 7:50 to 8:00 in the morning. (Tr. at A–134.) When Mr. Banks suggested that he leave his home 15 minutes earlier in order to avoid being detained by the buses and thus to insure that he was on time, Schreffler replied that he would then arrive at school by 7:45 a. m. and that he would follow Mr. Banks' suggestion if the Board allowed him to leave work 15 minutes earlier at night. (Tr. at A–132.) Certain of the Board members testified that they were offended by Schreffler's comments. (Tr. at B–75, 108.)

Board informed Schreffler that it had voted to reaffirm its earlier determination not to renew his contract. (Tr. at A–89.)

Schreffler filed this suit on May 8, 1979 alleging that defendants had violated his rights under the federal Constitution and Delaware law in the following respects: (1) Schreffler possessed a property interest in his employment and was deprived of that interest without due process of law; (2) defendants' decision not to renew Schreffler's contract was substantially based on Schreffler's relationship with Cordrey in violation of Schreffler's constitutional right to privacy; (3) defendants' decision not to renew Schreffler's contract was arbitrary and unreasonable and violated Schreffler's right to substantive due process; and (4) defendants' refusal to renew Schreffler's contract as principal constituted a breach of contract and a fraudulent misrepresentation in violation of Delaware law. After a six day trial, the jury found in favor of Schreffler on the right to privacy and procedural due process issues and awarded him $113,000 as compensatory damages.[8] In addition, the jury found that the individual defendants were not entitled to a good faith immunity defense but instead had each acted maliciously or wantonly in violating Schreffler's constitutional rights. Each individual defendant was assessed punitive damages in an amount ranging from $10,000 to $15,000. Finally, the jury found that the individual defendants were also each liable to the plaintiff for misrepresentation.[9]

---

**8.** The substantive due process and breach of contract claims were not submitted to the jury in the Special Interrogatories.

**9.** Because plaintiff was awarded compensatory damages on the constitutional claims, the jury did not award damages on the misrepresentation issue pursuant to the Court's instructions so as to avoid granting the plaintiff a double recovery.

**10.** Some courts have recognized limited exceptions to the Rule 50(b) requirement in instances where: (a) there has been substantial, though not literal, compliance with the rule; (b) where manifest injustice will otherwise occur since the verdict is wholly without legal support; (c) where the trial judge in effect excused the failure to renew the motion; and (d) where the

## II. *Judgment N.O.V.*

Defendants have moved for judgment notwithstanding the verdict pursuant to Rule 50(b), F.R.Civ.P. Under this rule, however, a party must move for a directed verdict at the close of all the evidence as a condition precedent to moving for judgment N.O.V. *See DeMarines v. K.L.M. Royal Dutch Airlines*, 580 F.2d 1193, 1195 n.4 (C.A.3, 1978); *Lowenstein v. Pepsi-Cola Bottling Co. of Pennsauken*, 536 F.2d 9, 10 (C.A.3), *cert. denied*, 429 U.S. 966, 97 S.Ct. 396, 50 L.Ed.2d 344 (1976). In this case, this prerequisite was not met. Although defendants' counsel moved for a directed verdict at the conclusion of the plaintiff's case, this motion was not renewed after presentation of all the evidence, as required by the rule. Accordingly, defendants may be deemed to have waived their right to move for judgment N.O.V. and the Court is without power to grant the motion. *Id.; see* 5A Moore's Federal Practice, ¶ 50.08 at 50–89, –90.[10]

## III. *New Trial or Amendment of the Judgment*

Defendants alternatively have moved for a new trial and/or for amendment of the judgment pursuant to Rule 59, F.R.Civ.P., on the grounds that the findings of the jury are against the weight of the evidence, that defendants were prejudiced by the conduct of plaintiff's counsel throughout the trial, and that the compensatory and punitive damage awards are excessive.[11] The Court concludes that al-

---

additional evidence was brief and inconsequential. *Smith v. University of North Carolina*, 632 F.2d 316, 339 (C.A.4, 1980). These exceptions clearly are not applicable to this case.

**11.** Defendants alternatively argue that a new trial must be granted because the jury purportedly failed to view the evidence with an open mind and ignored the instructions of the Court to view the facts impartially and to formulate an opinion only after the summation of counsel and charge by the Court. In support of this claim, defendants' counsel stated:

I noted that throughout the case that juror number 6 showed constant displeasure by laughing and smiling on almost all occasions when the board presented any evidence contrary to the Plaintiff. This started from the

though the first two grounds urged by the defendants are insufficient to mandate a new trial in this case, the jury award is excessive and defendants accordingly are entitled to a remittitur of both the compensatory and punitive damages.

Although most courts agree that the motion for a new trial is addressed to the sound discretion of the trial judge, *see Grove v. Dun & Bradstreet, Inc.*, 438 F.2d 433, 438 (C.A.3), *cert. denied*, 404 U.S. 898, 92 S.Ct. 204, 30 L.Ed.2d 175 (1971); *Parsons v. Doctors for Emergency Services*, 81 F.R.D. 660, 662 (D.Del.1979), there is little consensus on the criteria to be applied in determining whether a new trial is warranted. *See Lind v. Schenley Industries, Inc.*, 278 F.2d 79, 90 (C.A.3) (en banc), *cert. denied*, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960). Clearly, if the Court finds that a prejudicial error of law has been committed, a new trial may be ordered. *See Keystone Floor Products Co. v. Beattie Mfg. Co.*, 432 F.Supp. 869, 877 (E.D.Pa.1977); 11 Wright & Miller, Federal Practice and Procedure, Civil § 2805 at 38. Just as clearly, unlike a motion for a directed verdict or for judgment N.O.V., a motion for a new trial may be granted even though there may be substantial evidence to support the verdict if the Court determines that this action is necessary to prevent a miscarriage of justice. *See Bevevino v. Saydjari*, 574 F.2d 676, 683 (C.A.2, 1978); *Isley v. Motown Record Corp.*, 69 F.R.D. 12, 16 (S.D.N.Y. 1975); 11 Wright & Miller, *supra*, Civil § 2805 at 38. *See also Lewin v. Metropolitan Life Insurance Co.*, 394 F.2d 608, 614–15 (C.A.3, 1968). Beyond these general parameters the exact latitude extended to a court charged with reviewing a jury verdict has not been adequately defined. One emerging trend has been noted, however. Although at one time trial judges were pre-

sumed to have unbridled authority to grant a new trial, where a jury verdict is challenged on the ground that it is against the weight of the evidence, the modern tendency has been for the trial court to exercise a more limited judicial discretion in determining whether to set that verdict aside. *See Borras v. Sea-Land Service, Inc.*, 586 F.2d 881, 887 (C.A.1, 1978).

The underlying rationale for this trend is best supplied by the Third Circuit Court of Appeals in *Lind v. Schenley Industries, Inc., supra.* In that case, the Court distinguished new trials granted on the ground that the verdict is against the weight of the evidence from new trials granted because of claimed errors or defects in the conduct of the trial and stated that the former actions would be more closely scrutinized at the appellate level. *See Lind v. Schenley Industries, Inc., supra,* 278 F.2d at 90. The reasons for this disparate treatment are grounded in the nature of the jury function itself. Where claimed defects have occurred in the course of the trial, it is possible that the error contributed to the jury's receiving a distorted or incomplete version of the operative facts. Thus, by granting a new trial, the court has "deliver(ed) the jury from a possibly erroneous verdict arising from circumstances over which it had no control." *Id.* In contrast, in situations where the court determines that the verdict is against the weight of the evidence, it is the jury itself which purportedly has failed to perform properly the functions entrusted to it by law. *Id.* In such cases:

[W]here no undesirable or pernicious element has occurred or been introduced into the trial and the trial judge nonetheless grants a new trial on the ground that the verdict was against the weight of the evidence, the trial judge in negating the

point of opening remarks being made to the jury and continued throughout the entire trial. It has just been brought to my attention that at a point late in the trial this juror smiled and winked at Mrs. Cordrey (now Mrs. Schreffler) ....

I further noticed throughout the trial that the same juror number 6 had conversations during the trial by whispering and giggling with female juror number 5. Subsequently, her

facial expressions concerning the evidence became quite similar to those of juror number 6 and to a certain extent the same is true of juror number 4.

Docket Item 48. The Court finds that these allegations are too speculative a basis on which to conclude that the jury failed to adhere to the Court's instructions and did not faithfully discharge its functions in this case.

jury's verdict has, to some extent at least, substituted his judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of the facts. It then becomes the duty of the appellate tribunal to exercise a closer degree of scrutiny and supervision than is the case where a new trial is granted because of some undesirable or pernicious influence obtruding into the trial. Such a close scrutiny is required in order to protect the litigants' right to jury trial.

*Id.; See Hourston v. Harvlan,* 457 F.2d 1105, 1107 (C.A.3, 1972); *Grove v. Dun & Bradstreet, Inc., supra,* 438 F.2d at 438.

Thus, in reviewing defendants' first challenge to the jury verdict, that it is against the weight of the evidence, the Court must exercise a conscientious discretion, with due regard for the historical province and functions of the jury.

■ The Court finds that although the trial record is not free from ambiguities and contradictions, there is sufficient evidence from which a jury could find in favor of the plaintiff. The evidence was undisputed that Schreffler was advised by the Board that his contract would be renewed if his performance during his first two years was "satisfactory." In September, 1978, Schreffler received a "satisfactory" performance rating, which remained unchanged until the date of the December 11, 1978 hearing. Thus, the jury could reasonably conclude that Schreffler had a "legitimate claim of entitlement" to continued employment and that he was justified in believing that he would be reemployed unless adequate cause existed for non-renewal of his contract. Having found that Schreffler possessed a property interest in his job, the jury could further conclude that Schreffler did not receive the procedural due process to which he was entitled. As instructed by the Court, before a person possessing a property interest may be deprived of that interest, he must receive clear notice of the charges against him, an explanation of the evidence supporting the charges, a reasonable time

interval to marshal facts and evidence, and an opportunity for a hearing before an impartial decisionmaker. Although the testimony at trial established that an agenda containing notice that the Board would consider the renewal of Schreffler's contract was posted in a public place a few days prior to December 11 (Tr. at D–198), no personal notice was given to Schreffler until the morning of the Board meeting. Nor did Schreffler receive notice of the charges against him or an explanation of the evidence supporting those claims in advance of the meeting. Finally, the jury could also have determined that the January hearing, with its panoply of procedural safeguards, was insufficient to cure the prior breach of procedural due process because the Board had already prejudged the issue of renewing Schreffler's contract.

■ Although the evidence adduced by the plaintiff on the right to privacy claim was decidedly more ambiguous, the Court similarly cannot conclude that the jury's finding represents a miscarriage of justice. The only objective evidence presented at trial in support of plaintiff's privacy claim occurred in testimony concerning the November 6, 1978 administrators' meeting in which Bastian purportedly expressed his dismay over the Cordrey-Schreffler relationship, and the Board meeting which occurred that same day, in which three Board members present also allegedly reacted adversely when confronted with the news of the Cordrey-Schreffler liaison. Clearly, in order to find for the plaintiff on the privacy issue, the jury had to credit the testimony of Schreffler and Cordrey concerning these meetings and to disbelieve the testimony of the defendants. Moreover, the jury further had to infer an invidious purpose on the part of the defendants not to renew Schreffler's contract because of his relationship with Mrs. Cordrey, largely through circumstantial evidence extrapolated from these incidents and other testimony not directly relating to the Cordrey-Schreffler affair. Nonetheless, despite the relative paucity of objective evidence on this issue, it is the function of the jury, as the fact-finding body, to weigh the evidence presented at

trial and to draw inferences therefrom. *Gebhardt v. Wilson Freight Forwarding Co.*, 348 F.2d 129, 133 (C.A.3, 1965). The jury is peculiarly and appropriately suited to assess the credibility of witnesses and the Court cannot grant a new trial merely because the evidence is sharply in conflict, *see Parsons v. Doctors for Emergency Services*, 81 F.R.D. 660, 662 (D.Del.1979); *Gray v. Alpert*, 220 F.Supp. 887, 888 (W.D.Pa.1963), or because the Court itself would reach a different result. *Gebhardt v. Wilson Freight Forwarding Co., supra*, 348 F.2d at 133. Accordingly, the Court cannot grant a new trial on the ground that the verdict is against the weight of the evidence.

Defendants alternatively argue that the jury's award of $113,000 as compensatory damages and $77,500 as punitive damages is clearly excessive and requires the Court to grant a new trial. The Court agrees that the verdict is excessive, but believes that this defect can be adequately cured by granting a remittitur.

 The question of the excessiveness of a verdict likewise is primarily a matter to be addressed to the sound discretion of the trial judge. *Edynak v. Atlantic Shipping, Inc. CIE. Chambon*, 562 F.2d 215, 225–26 (C.A.3, 1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978); *Nelson v. Keefer*, 451 F.2d 289, 295 (C.A.3, 1971). If the damages assessed by the jury are "shocking to the judicial conscience" or "so unreasonable as to offend the conscience of the Court," the trial judge properly may set aside the award and grant a new trial. *See Murray v. Fairbanks Morse*, 610 F.2d 149, 152 (C.A.3, 1979); *Tann v. Service Distributors, Inc.*, 56 F.R.D. 593, 598 (E.D.Pa.1972), *aff'd without opinion*, 481 F.2d 1399 (C.A.3, 1973). The well established principle of re-

mittitur is ancillary to this right of the Court to grant a new trial on the ground that the jury verdict is excessive, *Mooney v. Henderson Portion Pack Co.*, 339 F.2d 64, 66 (C.A.6, 1964), and may be employed where necessary to restore the verdict to acceptable limits. Technically, where the verdict is so grossly excessive as to admit of no other conclusion than that it was the result of passion or prejudice, the proper remedy is a new trial and not remittitur. *See Lowe v. General Motors Corp.*, 624 F.2d 1373, 1383 (C.A.5, 1980); *Perfect Fit Industries v. ACME Quilting Co.*, 494 F.Supp. 505, 509 (S.D.N.Y.1980). Where, however, the verdict is not patently the product of bias, passion or prejudice, but simply is "just too much" for the Court conscionably to tolerate, the verdict may be modified by granting a remittitur. *See Lowe v. General Motors Corp., supra*, 624 F.2d at 1383.

 The Court properly instructed the jury that if it determined that defendants had violated plaintiff's constitutional rights, it should award damages sufficient to recompense him for back pay and other out-of-pocket expenses, physical and mental distress and injury both to his reputation and to his ability to pursue his chosen profession. (Tr. at F–108, 109). The evidence established that as of the date of trial, Schreffler had sustained approximately $17,000 in pecuniary losses.[12] Consequently, the jury awarded plaintiff almost $100,000 for such intangible injuries as emotional distress, humiliation, and damage to reputation and to plaintiff's ability to pursue his chosen field of endeavor. Although these factors are not amenable to precise measurement, the Court finds that the award is so inordinately large as to exceed the per-

---

**12.** These losses included approximately $18,000 in back pay for the school years 1979–80 and 1980–81, up until the date of trial. (Tr. at A–91, 92.) This figure was decreased by approximately $3,000 because of sums received from unemployment compensation. (Tr. at A–94.) In addition, Schreffler incurred other minor expenses, including $150 for a lawyer to represent him at the unemployment compensation hearing, and an unestimated minor sum for health insurance which he was forced to pay himself because of his loss of employment.

(*Id.*) Schreffler also testified that during the time he was principal, he taught economics in the evening at the local state college and that after his contract was not renewed he taught in another night program, incurring a loss of $1,735. (Tr. at A–93.) Plaintiff did not establish that this change of positions was occasioned by the Board's failure to renew his contract, however. Even including this latter sum in plaintiff's estimated losses, the out-of-pocket losses would amount to approximately $17,000.

missible bounds within which any reasonable jury could properly operate. *See Airlie Foundation, Inc. v. Evening Star Newspaper Co.*, 337 F.Supp. 421, 431 (D.D.C.1972).

Plaintiff briefly testified at trial that as a result of defendants' non-renewal of his contract, he suffered "severe emotional distress." (Tr. at A–95.) On several occasions, plaintiff would "wake up at 3:00 or 4:00 o'clock in the morning worrying ... about the possibility of ever getting a job in educational administration again," (*id.*) and on many mornings, plaintiff would feel "nauseous." (*Id.* at A–94.) Plaintiff never sought medical treatment for his condition, however.[13] In addition to these generalized claims of mental distress, plaintiff also testified that he nearly cried at two faculty meetings after his contract was not renewed (Tr. at A–94, 95), and that he was embarrassed and depressed about having to seek unemployment compensation (Tr. at A–95), a symptom which was emphasized by Mrs. Cordrey in her testimony. (Tr. at C–97 to 99.)

Plaintiff also claimed that after his contract was not renewed, he applied for 12 administrative positions, none of which he received. (Tr. at A–90.)[14] Although plaintiff did not directly link his unsuccessful efforts to procure another job with defendants' conduct in not renewing his contract, the jury could infer that there was a causal relationship between these two factors, and that plaintiff's ability to pursue his chosen profession was impaired by defendants' actions. Defendants introduced evidence, however, that Schreffler had also submitted an application for an administrative position in another school district after his first year at Delmar, before the events giving rise to this suit occurred, and that he also was not selected for that position. (Tr. at A–183.)

Considering the character and quality of the evidence presented in support of compensatory damages, the Court finds that the jury award of $113,000 is excessive, unreasonable and unsupported by the record such as to "shock the conscience of the court." *See Collum v. Butler*, 288 F.Supp. 918, 920 (N.D.Ill.1968), *aff'd*, 421 F.2d 1257 (C.A.7, 1970). In the Court's opinion, a reasonable jury could not have awarded an amount in excess of $51,000, which would include a sum of approximately $34,000 or double the amount of Schreffler's pecuniary losses, as compensation for Schreffler's alleged intangible injuries. In view of the Court's decision to grant plaintiff's motion for reinstatement, discussed later in this opinion, which should in large measure rectify any impairment of plaintiff's ability to pursue his chosen profession, even this award may be overgenerous.

The Court likewise concludes that the award of $77,500 in punitive damages is excessive and a corresponding remittitur will be granted.[15]

The Court instructed the jury that it could award punitive damages if it found that the defendants "maliciously" or "wantonly" violated any of the plaintiff's constitutional rights, and further explained: "An act or failure to act is 'maliciously' done if promoted or accompanied by ill will, or spite or grudge, toward the injured person. An act or failure to act is 'wantonly' done, if done in reckless or callous disregard of, or indifference to, the rights of the injured person." (Tr. at F–110.) The record does not reflect that any of the defendants harbored any personal animus toward Schreffler. Accordingly, the jury must have concluded that defendants' conduct in not renewing Schreffler's contract was taken in reckless disregard of, or indifference to, his constitutional rights.

13. Although Mrs. Cordrey testified that plaintiff sought medical treatment and received antibiotics to curb his physical ailments (Tr. at C-97), plaintiff himself testified under cross-examination that he never sought or received medical treatment for his condition. (Tr. at A-118.)

14. Plaintiff is presently teaching social studies in the Seaford School District. (Tr. at A-91.)

15. The award of $77,500 in punitive damages was assessed against each of the defendants individually as follows: Mr. Foxwell—$10,000; Mr. Banks—$15,000; Mrs. Hammond—$15,000; Mr. Bastian—$15,000; Mr. Calloway—$10,000; and Mrs. Hudson—$12,500.

As in any case where a court is asked to set aside a jury verdict and grant a new trial, it is difficult to determine what evidence played the largest role in the minds of the jury. The Court's difficulty in reviewing the award of punitive damages in this case is compounded by the fact that it does not know whether the jury based its award on a finding that defendants had wantonly violated plaintiff's right to procedural due process, or his right to privacy, or both. Nevertheless, the Court concludes that there was evidence in the record sufficient to submit both questions to the jury, and liability for punitive damages will be permitted to stand.

Superintendent Bastian's letter to Schreffler of December 19, 1978, which explained the reasons for the Board's decision not to renew Schreffler's contract indicated that the Board believed that Schreffler "had no expectancy of future employment in the District," and that the Board did not feel obligated to give Schreffler a statement of the reasons for its failure to renew his contract. (DX. 8.) There was evidence, nonetheless, that both Bastian and the Board members should have known that they created such an expectancy when they advised Schreffler that he would be rehired if his performance was satisfactory. There was also evidence that both Bastian and the Board were generally familiar with the concept of due process as applied in the context of teacher evaluations. (Tr. at E–49.) Bastian testified that he distributed to the Board in November, 1978, a document prepared by the Delaware School Boards Association which briefly explained the obligations of procedural due process, "including the right to notice of dismissal, a hearing, and, in some instances a statement of the reasons for dismissal." (*Id.*) In addition, both Bastian and the Board were acquainted with the rules of procedure for conducting student disciplinary hearings which generally provided for a full-scale adversary proceeding, complete with advance notice of the charges, the right to assistance of counsel and cross-examination, and other accoutrements traditionally associated with procedural due process. (Tr. at E–50 to 56.) Accordingly, there is some evidence in the record to sustain a finding that defendants were familiar with some of the requisites of due process, but nonetheless "wantonly" deprived Schreffler of his right to continued employment without the required procedural safeguards.

Whether defendants wantonly refused to renew Schreffler's contract in derogation of his right to privacy presents a closer and more troublesome question. The evidence presented by plaintiff on this issue was sharply disputed and even more attenuated. Nevertheless, to set aside the punitive damage award entirely and to grant a new trial on this issue would be to negate the jury's appraisal of credibility and impermissibly to substitute the Court's own contrary assessments. Accordingly, the jury's finding that defendants in this case acted in reckless disregard of plaintiff's constitutional rights does not represent a miscarriage of justice.

 The Court is of the opinion, however, that the reckless disregard suggested by the record, though enough to require submission of the issue to the jury, was not even remotely sufficient to justify the size of the punitive damage award, *Perfect Fit Industries v. ACME Quilting Co., supra,* 494 F.Supp. at 509. Unlike compensatory damages which are designed to recompense plaintiff for any harm inflicted as a result of defendants' wrongful conduct, punitive, or exemplary, damages bear no relation to plaintiff's injuries. Their object is simply to discourage the offending party from repeating the transgression, and to deter like-minded persons from committing similar offenses. *Collins v. Brown, supra,* 268 F.Supp. at 201. As such, when punitive damages are awarded, they must be large enough to act effectively as a deterrent. They should not, however, go beyond the level necessary to accomplish this purpose. *Anglo-American General v. Jackson National Life Ins. Co.,* 83 F.R.D. 41, 45 (N.D.Ca. 1979); *Collins v. Brown, supra,* 268 F.Supp. at 201.

The punitive award rendered by the jury in this case is considerably in excess of the amount reasonably necessary to deter these defendants or similarly situated persons

from committing similar transgressions in the future. With the exception of Superintendent Bastian, the defendants in this case were voluntary members of the School Board, each of whom was elected by the residents of the school district to serve a period of five years. (Tr. at D–151.) The testimony at trial established that the Board members devoted about ten to twelve hours of time a month to school affairs and served in their capacities without pay. (*Id.*) Moreover, there was no evidence in the record demonstrating that the members of the Board were anything but conscientious civic minded citizens prior to the occurrence of the circumstances of this case. Accordingly, while a nominal award of exemplary damages arguably may have been necessary to insure future compliance with constitutional requirements, the exorbitant penalties imposed by the jury will more likely inure to the public's detriment by unnecessarily deterring these defendants and other responsible citizens from serving in the voluntary capacity of members of the Board. *See Stolberg v. Members of Board of Trustees for State College of Conn.*, 474 F.2d 485, 489 (C.A.2, 1973).

Although Superintendent Bastian stands on somewhat different footing than the Board members, the Court also believes that the $15,000 in punitive damages awarded against him is equally shocking and excessive. At the time that this suit was brought, Bastian had served successively as teacher, Assistant Principal, Principal, and Superintendent of the Delmar School District over a period of 18 years. (Tr. at D–146.) Like the School Board defendants in this case, there was no evidence indicating that Bastian had been anything but a conscientious and committed teacher and administrator during his tenure at Delmar. In fact, his successful rise from teacher to Superintendent is testimony to the fact that Bastian enjoyed the confidence of his fellow teachers and the Board of Education. Although the jury could have found that Bastian did not exercise good judgment in dealing with Schreffler, his conduct was not so grossly egregious as to warrant the extraordinary penalties imposed by the jury.

Moreover, the large award could further have an "overkill" effect of dissuading competent teachers from seeking out administrative positions. Accordingly, upon careful review of the evidence in the case, the Court concludes that the award of punitive damages against Bastian was also excessive and may be brought within acceptable limits by a remittitur.

The Court finds that an aggregate punitive award of $7,750 will more than adequately serve to deter these defendants and other persons similarly situated from committing in the future the wrongful deeds found by the jury in this case. Consistent with the jury's initial allocation of the punitive damages, if the remittitur is accepted, the damages against each of the individual defendants will be assessed as follows: Mr. Foxwell—$1,000; Mr. Banks—$1,500; Mrs. Hammond—$1,500; Mr. Bastian—$1,500; Mr. Calloway—$1,000; and Mrs. Hudson—$1,250.

As their final argument in support of their motion for a new trial, defendants claim that they were unduly prejudiced by the conduct throughout the trial of plaintiff's counsel, Mr. Sheldon Sandler. Defendants buttress this contention by citing two incidents in which plaintiff's counsel allegedly irreparably prejudiced defendants' case. First, defendants cite Mr. Sandler's insinuation in front of the jury that a tape of the December 11, 1978 hearing, then being played into evidence, had been altered by defendants. Second, defendants claim that they were further prejudiced by Mr. Sandler's attempt to offer into evidence inadmissible hearsay concerning an alleged statement made by an administrator of another school district that plaintiff's contract was not renewed because of "moral turpitude."

Although the Court agrees that the statement concerning the tape of the December 11 hearing was both unfortunate and improper, it does not believe that defendants' claim merits the granting of a new trial. After the statement was made, Mr. Sandler, perhaps realizing the prejudicial nature of his remarks, requested a side-

bar conference. Pursuant to an agreement between both counsel and the Court at sidebar, Mr. Sandler then stated for the benefit of the jury that he was "in no way suggesting that there was any problem with the tape . . . [or] that there was any, as I say, tampering or anything like that." (Tr. at E–118.) In addition, the Court cautioned the jury immediately thereafter that "[w]hatever the attorneys said then is no evidence in this case. There is no indication of tampering. Just dismiss that from your minds." (*Id.*) The Court thus believes that any prejudice generated by Mr. Sandler's improper comment was cured by these statements.

The Court similarly does not believe that defendants were prejudiced by Mr. Sandler's effort to introduce testimony bearing on the "moral turpitude" statement. Defendants' counsel objected to Mr. Sandler's line of questioning on the grounds that it called for inadmissible hearsay, and the objection was sustained by the Court. (Tr. at E–149.) Moreover, testimony that the school administrator had made this remark was originally brought out by defendants' counsel earlier in the trial by his cross-examination of the plaintiff. (Tr. at A–119.) Over the objection of Mr. Sandler, the Court allowed defendants' counsel to call the administrator in question as a witness (Tr. at D–7 to 10) and the administrator testified that he never made that statement. (Tr. at D–16.) Consequently, defendants' claim of prejudice on this point is without merit.

IV. *Reinstatement and Expungement of Records*

Plaintiff has moved the Court for an order directing the defendants: (1) to reinstate him to his position as principal of Delmar High School under a three year contract extending from July 1, 1979 through June 30, 1982; and (2) to expunge all references to plaintiff's wrongful non-

renewal from records maintained by the Delmar School District. Defendants oppose the motion on the ground that the relief requested was not made a part of the pre-trial order and consequently plaintiff should be barred from seeking this relief, and because the request for reinstatement should have been decided by the jury because "it certainly would have had an impact on their decision in considering damages."

Defendants' objections are not well taken. Plaintiff's request for reinstatement and expungement of records was included in plaintiff's complaint, and it was not necessary to include this request for relief in the pre-trial order to preserve it for later disposition. Moreover, as defendants correctly acknowledge, the Court, and not the jury, is alone empowered to grant injunctive relief. The jury was properly instructed on the factors it could take into account in awarding compensatory damages pursuant to the agreed upon instructions submitted by counsel for both parties. Defendants' counsel, therefore, cannot be heard to complain at this late date about the criteria submitted to the jury for their consideration in determining damages.[16]

The Court finds that in order to restore plaintiff to the position he would have been in except for defendants' wrongful conduct, it must order the reinstatement and expungement of records requested by the plaintiff. An appropriate order reinstating plaintiff and expunging the records maintained by the Delmar School District will be entered conditioned on plaintiff's acceptance of the remittitur of the punitive and compensatory damages.

An order will be entered in accordance with this opinion.

---

**16.** Defendants' claim presumably rests on the premise that the jury may have awarded a disproportionate amount of compensatory damages for injury to plaintiff's ability to pursue his chosen profession and that the award would have been considerably less if the jury had been given the option of reinstating plaintiff to his position as principal. The Court believes, however, that any windfall gained as a result of plaintiff's reinstatement will be eliminated if the plaintiff accepts the remittitur suggested by the Court.